JOHNSON & MONTELEONE, L.L.P.
SAM JOHNSON
405 S. Eighth Street, Suite 250
Boise, Idaho  83702
Telephone: (208) 331-2100
Facsimile: (208) 947-2424
sam@treasurevalleylawyers.com

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
KEVIN SEELY
CHRISTOPHER WALTERS
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991
brobbins@robbinsumeda.com
kseely@robbinsumeda.com
cwalters@robbinsumeda.com

Attorneys for Plaintiff Gerald Moss

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| GERALD MOSS, Derivatively on Behalf of HECLA MINING COMPANY, | ) ) ) |
| Plaintiff, | ) )  Civil Action No. _____ |
| v. | ) ) |
| PHILLIPS S. BAKER, JR., JOHN H. BOWLES, TERRY V. ROGERS, CHARLES B. STANLEY, ANTHONY P. TAYLOR, TED CRUMLEY, GEORGE R. NETHERCUTT, JR., JAMES A. SABALA, and DAVID J. CHRISTENSEN, | )  VERIFIED SHAREHOLDER DERIVATIVE )  COMPLAINT FOR BREACH OF )  FIDUCIARY DUTY, WASTE OF )  CORPORATE ASSETS, AND UNJUST )  ENRICHMENT ) ) |
| Defendants, | ) ) |
| -and- | ) ) |
| HECLA MINING COMPANY, a Delaware corporation, | ) ) ) |
| Nominal Defendant. | )  **DEMAND FOR JURY TRIAL** |

## NATURE OF THE ACTION

1.     This is a verified shareholder derivative action brought on behalf of nominal defendant Hecla Mining Company ("Hecla" or the "Company") against certain of its directors and officers for breaches of fiduciary duties and other violations of law.  This matter arises out of the inadequate safety controls at the Lucky Friday Mine, which ultimately caused the closure of that mine.  Defendants' breaches of duty have caused and will continue to cause severe injury to Hecla's financial position and prospects, along with substantial damages to Hecla's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed the Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.     Hecla is the largest and lowest cash cost silver producer in the United States. While the Company also produces gold, lead, and zinc, Hecla's silver production is the Company's focal point and the source of the vast majority of its revenues.  Through its two operating mines, the Greens Creek Mine in southeast Alaska and the Lucky Friday Mine (sometimes referred to herein as "Lucky Friday") in northern Idaho, Hecla produced over 9.4 million ounces of silver in 2011 and generated revenues of approximately $334.7 million from silver sales, representing 70% of the Company's total revenues for the year.  Of the silver production, the Lucky Friday Mine produced nearly three million ounces of silver, or approximately 31% of the Company's total silver output.

3.     There has been no better time in recent history to be in the silver production business than now, as prices have more than tripled over the past six years and are projected to reach record-breaking levels in 2012.  As expected, Hecla has been a major beneficiary of this

trend, reporting record revenues and gross profits for the fiscal year ended December 31, 2011. These market conditions should have continued to be a boon for the Company.

4.      Unfortunately for the Company and its shareholders, the Company's ability to fully profit from this momentum has been gutted by the Company's fiduciaries' utterly reckless pursuit of revenues and profit at the expense of adequately addressing poor safety conditions at the Lucky Friday Mine.  As a result of the Board of Directors' (the "Board") dereliction in their responsibility to maintain the Company's mines in compliance with safety criteria enforced by the Federal Mine Safety and Health Administration ("MSHA"), on January 11, 2012, Hecla announced that its Lucky Friday Mine would be closed for up to a year following a series of serious accidents and a glut of MSHA citations.

5.      Hecla's Lucky Friday Mine has a long history of citations from the MSHA. Worse, MSHA has cited the Lucky Friday Mine with an increasing frequency through 2010.  On average, the MSHA cited Lucky Friday twenty-eight times per year from 2001 to 2005. Between 2006 to 2010, this figure shot up to fifty-three times on average per year from 2006 to 2010, representing an increase of nearly 90%.  To date, *Lucky Friday has received over 630 separate citations since 2001*, illustrating the Individual Defendants' (as defined herein) consistent failure to effectively address safety issues at the Lucky Friday Mine, despite their awareness of the magnitude and duration of MSHA citations.

6.      The Individual Defendants also were aware by 2010 of much more rigorous mine safety regulations and procedures instituted by the MSHA.  In response to the tragic mining accident at Massey Energy Company's Upper Big Branch Mine on April 5, 2010, the MSHA announced special "impact inspections" at both metal and non-metal mines around the country. The Individual Defendants were put on notice of these more stringent regulations and procedures

by no later than October 19, 2010, when the MSHA issued a press release confirming the program. Finally, the Individual Defendants acknowledged the dire effect failure to conform to legal and regulatory requirements could have on the Company as a whole in the "Risk Factors" section of Hecla's Form 10-Ks filed with the U.S. Securities and Exchange Commission ("SEC").

7.     In 2011, following years of the Board flouting mine safety requirements in contravention of MSHA regulations, the consequences of the Lucky Friday Mine's safety noncompliance became tragic and costly. First, on April 15, 2011, a miner was killed in the Lucky Friday Mine when his work area collapsed. Then, on November 17, 2011, another miner was fatally injured after being buried in rubble in the Lucky Friday Mine. Most recently, on December 14, 2011, seven miners were injured and hospitalized following a rock burst in the Lucky Friday Mine. These disastrous events reflect the widespread and varying nature of the safety hazards present in the Lucky Friday Mine.

8.     The consequences of these catastrophic events have and will continue to be extremely damaging to the Company. First, in response to the April 15, 2011 incident, the MSHA recommended Hecla be *fined nearly $1 million*. Thereafter, in the wake of the December 14, 2011 incident and the subsequent special impact investigation conducted by the MSHA at the Lucky Friday Mine, *the MSHA issued a closure order for Lucky Friday and issued fifty-nine citations*. In response, the Company issued a press release on January 11, 2012, disclosing that in order to comply with the MSHA's closure order, the Lucky Friday Mine would be closed through the end of 2012. The resultant loss in silver production is expected to cost Hecla *at least $80 million to $100 million*. Most recently, on February 21, 2012, Hecla disclosed that it will cost *an additional $50 million to bring the Lucky Friday Mine into compliance* with MSHA safety regulations.

9.     The Individual Defendants were aware of the extreme risks associated with continued noncompliance with legal safety requirements by the time the MSHA issued its October 19, 2010 press release.  As such, from the Individual Defendants' first subsequent public statement on October 26, 2010, until the January 11, 2012 disclosure concerning the closure of Lucky Friday, the Individual Defendants' improperly concealed that: (i) the Company was not in compliance with safety regulations at its Lucky Friday Mine; (ii) the Company had allowed sand and concrete material to improperly build up in one of the Lucky Friday Mine shafts over a period of years, creating a safety hazard; (iii) following the December closure, the Company would be unable to reestablish mining operations at the Lucky Friday Mine by February 2012; (iv) the Company improperly accounted for its contingent liabilities in violation of Generally Accepted Accounting Principles ("GAAP"); and (v) based on the foregoing, defendants lacked a reasonable basis for their positive statements about the Company's operations and its expected silver production.

10.     In the wake of the January 11, 2012 disclosure, Hecla's value plunged more than 21%, or $1.23 per share to close at $4.41 compared to the previous trading day's closing of $5.84, erasing almost $344 million in market capitalization.  As a direct result of defendants' unlawful course of conduct, the Company is now the subject of two federal securities class action lawsuits filed in the U.S. District Court for the District of Idaho on behalf of investors who purchased Hecla's shares between October 26, 2010 and January 11, 2012, inclusive.  The federal securities class action lawsuits expose the Company to potentially hundreds of millions of dollars in damages.

11.     The Insider Selling Defendants (as defined herein) did not let their personal wealth suffer, however, cashing out their Company holdings before the truth emerged.  These

Insider Selling Defendants used their knowledge of the material, non-public information concerning Hecla to sell over $3.1 million of their personal holdings while the Company's stock was artificially inflated.

12.     Despite the Company's abysmal safety record with respect to the Lucky Friday Mine, the Individual Defendants refused to act to cure its safety issues and instead operated the mine illegally in noncompliance with safety requirements.  The Individual Defendants casted aside the duty to protect Hecla from the known and extreme risk of material adverse consequences associated with inadequate safety controls at the Lucky Friday Mine.  Plaintiff brings this action to hold the Individual Defendants accountable for the substantial damages that their actions and reckless inaction has and will continue to cause the Company.

## JURISDICTION AND VENUE

13.     Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) Hecla maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Hecla, occurred in this District; and (iv) defendants have received

substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

16.     Plaintiff Gerald Moss was a shareholder of Hecla at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Hecla shareholder.  Plaintiff is a citizen of Oregon.

**Nominal Defendant**

17.     Nominal Defendant Hecla is a Delaware corporation engaged in the discovery, acquisition, development, production, and marketing of silver, gold, lead, and zinc.  Hecla produces lead, zinc, and bulk concentrates, which it sells to custom smelters and unrefined gold and silver bullion bars (doré), which can be sold as doré or further refined before sale to precious metal traders.  Hecla is organized and managed through two segments that encompass its operating units: the Greens Creek and Lucky Friday units.  The Greens Creek Unit is located near Juneau, Alaska and produces zinc, lead, and bulk concentrates as well as gold and silver doré.  The Lucky Friday unit is located in northern Idaho and produces lead and zinc concentrates.  The concentrates produced at the Greens Creek and Lucky Friday units contain payable silver, zinc, and lead, and the concentrates produced at Greens Creek also contain payable gold.  Hecla's principal executive offices are located at 6500 North Mineral Drive, Suite 200, Coeur d'Alene, Idaho.

**Defendants**

18.     Defendant Phillips S. Baker, Jr. ("Baker") is Hecla's Chief Executive Officer and has been since May 2003; President and has been since November 2001; and a director and has been since November 2001.  Baker was also Hecla's Chief Financial Officer ("CFO") from May

2001 to June 2003; Chief Operating Officer from November 2001 to May 2003; and a Vice President from May 2001 to November 2001.  Baker is named as a defendant in a securities class action complaint that alleges he violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Baker knowingly, recklessly, or with gross negligence failed to maintain safety controls at the Lucky Friday Mine in compliance with safety laws and regulations, and made improper statements in the Company's press releases and public filing concerning: (i) the Company's compliance with safety regulations with respect to the Lucky Friday Mine; (ii) the Company's ability to reestablish operations at the Lucky Friday Mine by February 2012 given the safety hazards present; and (iii) the Company's accounting for contingent liabilities.  While in possession of material, non-public information concerning Hecla's true business health, Baker sold 246,000 shares of his stock for $1,962,268.20 in proceeds.  Hecla paid Baker the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Qualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------------------------|------------------------|-------|
| 2010 | $445,000 | $436,220 | $441,744 | $1,133,700 | $445,799 | $12,792 | $2,915,255 |

Defendant Baker is a citizen of Washington.

19.     Defendant James A. Sabala ("Sabala") is a Hecla Senior Vice President and has been since March 2008 and Hecla's CFO and has been since May 2008.  Sabala is also named as a defendant in a securities class action complaint that alleges he violated Sections 10(b) and 20(a) of the Exchange Act.  Sabala knowingly, recklessly, or with gross negligence failed to maintain safety controls at the Lucky Friday Mine in compliance with safety laws and regulations, and made improper statements in the Company's press releases and public filing concerning: (i) the Company's compliance with safety regulations with respect to the Lucky Friday Mine; (ii) the Company's ability to reestablish operations at the Lucky Friday Mine by

February 2012 given the safety hazards present; and (iii) the Company's accounting for contingent liabilities. While in possession of material, non-public information concerning Hecla's true business health, Sabala sold 124,406 shares of his stock for $1,094,493.38 in proceeds. Hecla paid Sabala the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Qualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------------------------|------------------------|-------|
| 2010 | $280,000 | $145,408 | $147,249 | $387,464 | $77,398 | $15,917 | $1,053,436 |

Defendant Sabala is a citizen of Idaho.

20.     Defendant John H. Bowles ("Bowles") is a Hecla director and has been since 2006. Bowles is also Chairman of Hecla's Audit Committee and has been since at least April 2010 and a member of Hecla's Health, Safety, Environmental & Technical Committee ("HSET Committee") and has been since at least April 2010. Bowles knowingly or recklessly failed to maintain adequate safety controls at the Lucky Friday Mine in compliance with safety laws and regulations, and made improper statements in the Company's press releases and public filing concerning: (i) the Company's compliance with safety regulations with respect to the Lucky Friday Mine; (ii) the Company's ability to reestablish operations at the Lucky Friday Mine by February 2012 given the safety hazards present; and (iii) the Company's accounting for contingent liabilities. Further, defendant Bowles, Chairman of the Audit Committee during the relevant period, reviewed and approved improper statements and statements in violation of GAAP. Hecla paid Bowles the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|-------------|-------------------|--------------|-------|
| 2010 | $80,000 | $61,524 | $141,524 |

Defendant Bowles is a citizen of Canada.

21.     Defendant Terry V. Rogers ("Rogers") is a Hecla director and has been since 2007. Rogers is also Chairman of Hecla's HSET Committee and has been since at least February 2012, a member of that committee and has been since at least April 2010, and a member of Hecla's Audit Committee and has been since at least April 2010. Rogers knowingly or recklessly failed to maintain adequate safety controls at the Lucky Friday Mine in compliance with safety laws and regulations, and made improper statements in the Company's press releases and public filing concerning: (i) the Company's compliance with safety regulations with respect to the Lucky Friday Mine; (ii) the Company's ability to reestablish operations at the Lucky Friday Mine by February 2012 given the safety hazards present; and (iii) the Company's accounting for contingent liabilities. Further, defendant Rogers, a member of the Audit Committee During the relevant period, reviewed and approved improper statements and statements in violation of GAAP. Hecla paid Rogers the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $76,000 | $61,524 | $137,524 |

Defendant Rogers is a citizen of Idaho.

22.     Defendant Charles B. Stanley ("Stanley") is a Hecla director and has been since 2007. Stanley is also a member of Hecla's Audit Committee and has been since at least April 2010 and a member of Hecla's HSET and has been since at least April 2010. Stanley knowingly or recklessly failed to maintain adequate safety controls at the Lucky Friday Mine in compliance with safety laws and regulations, and made improper statements in the Company's press releases and public filing concerning: (i) the Company's compliance with safety regulations with respect to the Lucky Friday Mine; (ii) the Company's ability to reestablish operations at the Lucky Friday Mine by February 2012 given the safety hazards present; and (iii) the Company's accounting for contingent liabilities. Further, defendant Stanley, a member of the Audit

Committee, reviewed and approved improper statements and statements in violation of GAAP. Hecla paid Stanley the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $64,000 | $61,524 | $125,524 |

Defendant Stanley is a citizen of Utah.

23.    Defendant Anthony P. Taylor ("Taylor") is a Hecla director and has been since 2002. Taylor is also a member of Hecla's HSET Committee and has been since at least April 2010 and was Chairman of that committee from at least April 2010 to at least March 2011. Taylor knowingly or recklessly failed to maintain adequate safety controls at the Lucky Friday Mine in compliance with safety laws and regulations, and made improper statements in the Company's press releases and public filing concerning: (i) the Company's compliance with safety regulations with respect to the Lucky Friday Mine; (ii) the Company's ability to reestablish operations at the Lucky Friday Mine by February 2012 given the safety hazards present; and (iii) the Company's accounting for contingent liabilities. While in possession of material, non-public information concerning Hecla's true business health, Taylor sold 14,724 shares of his stock for $107,311.68 in proceeds. Hecla paid Taylor the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $76,000 | $61,524 | $137,524 |

Defendant Taylor is a citizen of Nevada.

24.    Defendant Ted Crumley ("Crumley") is Hecla's Chairman of the Board and has been since May 2006 and director and has been since 1995. Crumley knowingly or recklessly failed to maintain adequate safety controls at the Lucky Friday Mine in compliance with safety laws and regulations, and made improper statements in the Company's press releases and public filing concerning: (i) the Company's compliance with safety regulations with respect to the

Lucky Friday Mine; (ii) the Company's ability to reestablish operations at the Lucky Friday Mine by February 2012 given the safety hazards present; and (iii) the Company's accounting for contingent liabilities.  Hecla paid Crumley the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $114,000 | $61,524 | $175,524 |

Defendant Crumley is a citizen of Idaho.

25.    Defendant George R. Nethercutt, Jr. ("Nethercutt") is a Hecla director and has been since 2005.  Nethercutt knowingly or recklessly failed to maintain adequate safety controls at the Lucky Friday Mine in compliance with safety laws and regulations, and made improper statements in the Company's press releases and public filing concerning: (i) the Company's compliance with safety regulations with respect to the Lucky Friday Mine; (ii) the Company's ability to reestablish operations at the Lucky Friday Mine by February 2012 given the safety hazards present; and (iii) the Company's accounting for contingent liabilities.  Hecla paid Nethercutt the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $72,000 | $61,524 | $133,524 |

Defendant Nethercutt is a citizen of Virginia.

26.    Defendant David J. Christensen ("Christensen") was a Hecla director from August 2003 to May 2011 and from May 2002 to October 2002.  Christensen was also a member of Hecla's Audit Committee from at least April 2010 to at least March 2011.  Christensen knowingly or recklessly failed to maintain adequate safety controls at the Lucky Friday Mine in compliance with safety laws and regulations, and made improper statements in the Company's press releases and public filing concerning: (i) the Company's compliance with safety regulations with respect to the Lucky Friday Mine; (ii) the Company's ability to reestablish operations at the

Lucky Friday Mine by February 2012 given the safety hazards present; and (iii) the Company's accounting for contingent liabilities.  Further, defendant Christensen, a member of the Audit Committee during the relevant period, reviewed and approved improper statements and statements in violation of GAAP.  Hecla paid Christensen the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2010 | $76,000 | $61,524 | $137,524 |

Defendant Christensen is a citizen of California.

27.     The defendants identified in ¶¶18-19 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶18, 20-26 are referred to herein as the "Director Defendants."   The defendants identified in ¶¶20-23 are referred to herein as the "HSET Committee Defendants."  The defendants identified in ¶¶20-23, 26 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶18, 19, 23 are referred to herein as the "Insider Selling Defendants."  The defendants identified in ¶¶18-26 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

28.     By reason of their positions as officers, directors, and/or fiduciaries of Hecla and because of their ability to control the business and corporate affairs of Hecla, the Individual Defendants owed and owe Hecla and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Hecla in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Hecla and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

29.     Each officer and director of the Company owes to Hecla and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  To discharge their duties, the officers and directors of Hecla were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Hecla were required to, among other things:

(a)     exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     not trade on material inside information;

(c)     exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(d)     when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence; and

(e)     in addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

**Additional Duties of the HSET Committee Defendants**

30.     In addition to these duties, under the Company's Charter in effect since August 23, 2010, the HSET Committee Defendants, defendants Bowles, Rogers, Stanley, and Taylor owed specific duties to Hecla to review the Company's health, safety, and environmental policies, to review emerging health, safety, and environmental trends in legislation and regulations affecting the Company, to ensure that the Company's compliance systems are effective, and to report compliance issues and other significant matters to the Board.  The HSET Committee's Charter provides in relevant part that the HSET Committee's duties and responsibilities require it to:

- Review health, safety and environmental policies;

- Review and discuss with management, any material noncompliance with health, safety or environmental laws, and management's response to such noncompliance;

- Review and discuss with management, any pending or threatened administrative, regulatory, or judicial proceedings regarding health, safety or the environment that are material to the Company;

- Insure that management monitors significant trends in health, safety and environmental legislation; and

- Receive and review updates from management regarding health, safety and environmental performance of the Company and its subsidiaries.

**Additional Duties of the Audit Committee Defendants**

31.     In addition to these duties, under the Company's Charter in effect since January 1, 2007, the Audit Committee Defendants, defendants Bowles, Christensen, Rogers, and Stanley, owed specific duties to Hecla concerning the Company's financial reporting, risk control, and legal compliance, including assessing the Company's risk and risk management, ensuring the Company's financial statements are complete and reflect appropriate accounting principles, reviewing the Company's accounting estimates and use of reserves and accruals, and reviewing

legal compliance matters and ensuring the proper systems exist to ensure that the Company's financial statements and public disclosures comply with legal requirements.    The Audit Committee Charter provides in relevant part that the Audit Committee's duties and responsibilities require it to:

- Review significant accounting and reporting issues, including recent professional and regulatory pronouncements and consider their impact on the financial statements;

- Discuss policies with respect to risk assessment and risk management with management and the independent auditor;

- Review and discuss with management and the independent auditor the Company's annual and interim financial statements and determine whether they are complete and consistent with the information known to committee members, and assess whether the financial statements reflect appropriate accounting principles;

- Review with management and the independent auditor the accounting treatment accorded significant transactions, any significant accounting issues, the development, selection and disclosure of critical accounting estimates, regulatory and accounting initiatives, and off-balance sheet structures, and the Company's use of reserves and accruals;

- Ensure that management has the proper review system in place to ensure that the Company's financial statements, reports and other financial information disseminated to governmental organizations and the public, comply with applicable legal requirements;

- Review any evidence of material violations of securities law, breach of fiduciary duty or similar violation by the Company or any Company agent disclosed to it by the Company's counsel; and

- Review legal compliance matters with the Company's counsel that could have a significant impact on the Company's financial statements

**Control, Access, and Authority**

32.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Hecla, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

33.     Because of their advisory, executive, managerial, and directorial positions with Hecla, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and growth prospects of Hecla.  While in possession of this material, non-public information, the Individual Defendants made improper representations regarding the Company, including information regarding safety controls at Hecla's Lucky Friday Mine.

34.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Hecla, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

35.     To discharge their duties, the officers and directors of Hecla were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Hecla were required to, among other things:

(a)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)     refrain from acting upon material, inside corporate information to benefit themselves;

(d)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(e)     remain informed as to how Hecla conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**Breaches of Duties**

36.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Hecla, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of Hecla's Board.

37.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to maintain noncompliant safety controls at the Lucky Friday Mine in contravention of applicable laws and regulations.

The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct, the Company is now facing hundreds of millions of dollars in damages and is the subject of class action lawsuits that allege violations of securities laws. As a result, Hecla has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

38.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

39.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) conceal the adequacy of the Company's safety controls at the Lucky Friday Mine; (ii) deceive the investing public, including shareholders of Hecla, regarding the Individual Defendants' management of Hecla's operations, especially the Lucky Friday Mine; (iii) facilitate defendants Baker, Sabala, and Taylor's illicit sale of over $3.1 million of their personally held shares while in possession of material, non-public information; and (iv) enhance the Individual Defendants' executive and directorial positions at Hecla and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

40.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

41.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

42.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

43.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## HECLA AND THE SILVER INDUSTRY

44.     Hecla is the largest and lowest cash cost silver producer in the United States. Established in 1891, Hecla and its subsidiaries discover, acquire, develop, produce, and market silver, gold, lead, and zinc.  The Company produces lead, zinc, and bulk concentrates, which it sells to custom smelters and unrefined gold and silver bullion bars, which may be sold as bullion

bars or further refined before sale to precious metals traders. Though the Company has interests in various precious and base metals, the focal point of Hecla's production and the source of the vast majority of its revenues - approximately 70% in 2011 - and profits is its silver production.

45.     The Company is organized into two segments that encompass its operating units: the Greens Creek and Lucky Friday Mines. The Greens Creek Unit, located in southeast Alaska and owned and operated through various joint venture arrangements, has been in production since 1989. The Lucky Friday mine has been owned and operated by Hecla since 1958 and is a deep underground silver, lead, and zinc mine located in the Coeur d'Alene Mining District in northern Idaho. All production in the Lucky Friday mine is by underground mining methods and access to the underground workings is via an eighteen-foot diameter concrete lined shaft known as Silver Shaft.

46.     One hundred percent of Hecla's ore production, and thus all of its revenues and profit, emanates from its two mining properties, which both primarily produce silver. While smaller than its counterpart in terms of production, the Lucky Friday Mine represents a substantial portion of the Company's business. In 2011, the Lucky Friday Mine produced nearly three million ounces of silver, generated over $134 million in revenues, including approximately $105 million from silver production, and accounted for over $76 million of the Company's total gross profits. Of the Company's overall 2011 silver production, the Lucky Friday Mine accounted for approximately 31% of the Company's total silver output, and revenues from Lucky Friday's silver contributed approximately 22% to Hecla's total revenues.

47.     With 70% of its total yearly revenue generated from silver sales, the Company has benefited handsomely from the rising market prices for silver. The Company's silver sales have risen rapidly over the past five years, consistently driving Hecla's overall revenues and gross

profit to higher levels in each of the past five years. Indeed, on February 21, 2012, Hecla announced record revenues of $477.6 million and gross profit of $265 million for fiscal year 2011, representing massive increases over fiscal year 2005 revenues and gross profits of $110.2 million and $35 million, respectively. The Lucky Friday Mine's silver production, revenues, and gross profits also rose steadily from 2005 to April 2011 before long-standing dangerous conditions led to a series of catastrophic events that began interrupting production at Lucky Friday.

48.     Hecla's future outlook looked incredibly bright as a result of a stellar silver market exhibiting few signs of slowing. Silver prices have more than tripled over the past six years and are projected to reach record-breaking levels in 2012. Most recently, from 2010 to 2011, the silver price experienced a 74% increase, reaching silver price levels that had not been seen in thirty-one years.

49.     Growing strength of investor and industrial demand for silver continues to drive the market price of silver higher. In 2010, world investment in silver rose by an impressive 40% to 279.3 million ounces, resulting in a net flow into silver of $5.6 billion, nearly doubling 2009's figure. Many experts predict silver prices will continue their meteoric climb to reach new record-breaking levels in 2012. According to HSBC Securities, demand for silver will be sustained by global concerns about fiscal profligacy and the long-term sustainability of the U.S. dollar, among other factors. As a result, silver prices are projected to remain strong over the long term.

## INDIVIDUAL DEFENDANTS' KNOWLEDGE OF SUBSTANTIAL RISKS CONCERNING LUCKY FRIDAY

50.     Unfortunately, the Company's ability to fully profit from this strong market has been significantly hampered by the Board's utterly reckless pursuit of revenues and profit at the

expense of adequately addressing poor safety conditions at the Lucky Friday Mine. Despite knowledge of the Lucky Friday Mine's extensive record of MSHA citations, the heightened risk of additional and more severe citations due to the MSHA's new special impact inspections, and the material business, financial, and operating risks Hecla could face as a result of MSHA regulations, the Individual Defendants completely failed to ensure that the Lucky Friday Mine's safety systems and protocols were in compliance with legal requirements. As a result of the Board's willful or reckless disregard for the responsibility to maintain the Company's mines in compliance with safety criteria enforced by the MSHA, on January 11, 2012, Hecla announced that its Lucky Friday Mine would be closed for up to a year following a series of serious accidents and a flood of MSHA citations.

51.    Hecla's Lucky Friday Mine has a long history of citations, which had been increasing in frequency through 2010. Lucky Friday had been cited twenty-eight times on average per year from 2001 to 2005 before this figure shot up to fifty-three times on average per year from 2006 to 2010, representing an increase of nearly 90%. In total to date, *Lucky Friday has received over 630 separate citations since 2001*, illustrating the Individual Defendants' consistent failure to effectively address safety issues at the Lucky Friday Mine, despite the enormous volume and increasing frequency of MSHA citations.

52.    Also, in mid-2010, a widely publicized event occurred that would significantly alter the regulatory and oversight climate in the mining industry and ensure that mine operators such as Hecla would be subject to heightened scrutiny. On April 5, 2010, an explosion at the Upper Big Branch Mine in West Virginia killed twenty-nine miners in the worst U.S. coal mining disaster in forty years. In response, the MSHA began instituting concentrated special "impact inspections" at both metal and non-metal mines around the country. The Individual

Defendants were put on notice of these more rigorous inspections by no later than October 19, 2010, when the MSHA issued a statement that the inspections were continuing in earnest and that the MSHA had already issued numerous closure orders as a result of its findings. Notwithstanding the imminent risk posed by the MSHA's increased vigilance to inspect and cite mines operating illegally in noncompliance with safety regulations, the Individual Defendants failed to ensure that the Lucky Friday Mine had adequate safety systems and protocols in compliance with applicable legal requirements.

53.     Further, Hecla acknowledges in its annual Form 10-K that risks associated with government regulation, including "mine safety," and mining accidents could "materially adversely affect [the Company's] business, financial condition or operating results."  In the risk factor concerning government regulation contained in Hecla's Form 10-K filed on February 25, 2011, the Company even specifically provides as an example citation it received from the MSHA, which demonstrates the Individual Defendants' awareness of the serious, "materially adverse" impact noncompliance with MSHA safety regulations could have on the Company. Notably, that Form 10-K was signed by each and every one of the Individual Defendants. However, despite knowledge of the Lucky Friday Mine's extensive record of MSHA citations, the heightened risk of additional and more severe citations due to the MSHA's new special impact inspections, and the material business, financial, and operating risks Hecla could face as a result of MSHA regulations, the Individual Defendants completely failed to ensure that the Lucky Friday Mine's safety systems and protocols were in compliance with legal requirements, despite the magnitude and duration of the citations of the Lucky Friday Mine.

## TRAGEDY BEFALLS LUCKY FRIDAY AND HECLA

54.     On April 15, 2011, two miners, Larry and Michael Marek, began their shifts at the Lucky Friday Mine.  The Mareks were both production miners assigned to perform various tasks

to advance a stope, which is a steplike part of a mine where minerals are extracted. They fixed a spray chamber in the ventilation raise to help cool the stope and then watered down the muck in the stopes to cool the work area. Approximately one hour into their shift, Michael Marek had finished watering the muck in the east stope when he heard the ground caving in where Larry Marek was watering and felt a tremendous rush of air. As the east stope quickly filled with dust and debris, Michael Marek ran to the west side only to find the stope completely caved in.

55.     A crew was contacted for assistance to remove the fallen ground and the MSHA was notified of the accident and immediately dispatched its personnel to the mine. Rescue crews worked around the clock removing material from the ground failure location and after an extensive effort, Larry Marek's body was recovered on April 24, 2011. Larry Marek's cause of death was attributed to blunt force trauma from the rock fall, which was approximately ninety feet long, twenty feet wide, and thirty feet high.

56.     The MSHA assembled an accident investigation team on April 15, 2011, and traveled to the Lucky Friday Mine to conduct a physical inspection of the accident scene, interview employees, and review documents and work procedures relevant to the accident. The investigation of the fatal accident resulted in penalties against Hecla and a scathing investigation report released by the MSHA on December 2, 2011, in which the MSHA blamed the catastrophe on inadequate safety measures and Company negligence and cited Hecla's mining methods used in the west slope as "a departure from typical mining methods." The MSHA's report stated, in pertinent part:

> ***The accident occurred because management did not have policies and procedures that provided for the safe mining of split stopes in a multi-vein deposit.*** Management failed to design, install, and maintain a support system to control the ground in places where miners worked and traveled. Additionally, management failed to ensure that appropriate supervisors or other designated persons examined or tested the ground conditions where the fall occurred.

57.    Despite the scrutiny of the MSHA and the Individual Defendants' acute, continued knowledge of illegally unsafe mine conditions resulting from the fatal accident at the Lucky Friday Mine in April of 2011, Hecla continued to operate the Lucky Friday Mine illegally in noncompliance with safety regulations.  On November 17, 2011, Hecla's blatant disregard for safety resulted in the death of another miner.  Twenty-six year old Brandon Gray and a fellow miner were attempting to dislodge muck in a bin excavation when the muck they were standing on started to flow.  Brandon was wearing a safety harness attached to a self-retracting lanyard that was designed to lock and retract to prevent sudden falls.  However, the lanyard extended and did not lock before he became engulfed in the muck.  The other miner was freed immediately, treated, and released from the hospital.  Brandon Gray died at the hospital on November 19, 2011.

58.    The MSHA began an investigation into this second fatal accident on November 17, 2011.  The investigation is ongoing and thus far only a preliminary report of the accident has been released.  The November 2011 fatal accident was deemed "unrelated" to the fatal April 2011 accident, an indication of the widespread and varying nature of the safety hazards present in the Lucky Friday Mine.

59.    Less than one month after the November 2011 accident, the Lucky Friday Mine faced yet another disastrous event that injured and hospitalized seven miners and opened a third MSHA impact investigation into the Company's safety compliance.  On December 14, 2011, miners were working 5,900 feet below the surface when a rock burst occurred, injuring and hospitalizing seven miners who were working to erect a system of mesh material designed to contain such bursts.

60.     The December 14, 2011 accident resulted in the MSHA opening another special impact investigation into Lucky Friday Mine, which was conducted from December 16th to December 23rd and resulted in a multitude of citations and orders issued to the Company. Among the violations cited was a repeated failure to maintain established ground support systems throughout the mine. In addition, the report stated that: (i) ground support fixtures in several areas had not been installed or torqued properly; (ii) shafts had not been systematically inspected, tested and maintained, and steel structures in the shaft were not kept clean of hazardous materials; (iii) multiple areas of the mine had not been provided with two separate escape ways; (iv) explosives magazines had not been constructed and located to protect miners from the risk of unintended explosions; (v) underground shop doors were improperly constructed to ensure fire protection; (vi) elevated walkways in multiple areas were not provided with substantially constructed handrails; and (vii) travel areas were not kept clean and orderly, resulting in slip, trip, and fall hazards.

61.     In addition to the litany of citations and orders, the MSHA also ordered the temporary shutdown of Lucky Friday Mine on December 15, 2011. "*We've issued a closure order so the entire mine is shut down*," said Amy Louviere, a spokeswoman for the agency in Washington D.C. "We will conduct a thorough investigation and we will not allow it to reopen until we are sure it is safe." On January 5, 2012, the MSHA issued a closure order for the Lucky Friday Mine, citing built-up material in the shaft and on January 11, 2012, the Company announced that operations at Lucky Friday Mine would not resume until early 2013.

62.     The consequences of these catastrophic events have been dire for the Company. In its report on the April 15, 2011 incident, *the MSHA accused Hecla of safety failures that led to the miner's death, concluded that the death was a result of negligence by the Company and*

- 26 -

*its personnel, and recommended nearly $1 million in fines*.  The damage to Hecla would only worsen from there.  Following the December 14, 2011 incident, the MSHA conducted a special impact investigation at the Lucky Friday Mine.  Thereafter, following the discovery of a litany of safety violations including sand and concrete that had been leaking into one of the mine shafts for a number of years, on January 5, 2012, the MSHA issued a closure order for the Lucky Friday Mine.  In all, the MSHA issued fifty-nine citations to Hecla for twenty-seven different safety violations as a result of the special impact investigation – of those twenty-seven distinct types of violations, sixteen of them represented *repeat violations for which Hecla had received a combined 171 citations over the previous decade*.

63.     While the full adverse impact on Hecla of the Individual Defendants' failure to ensure that the Lucky Friday Mine had adequate safety systems and protocols will continue to evolve, the first shoe dropped on January 11, 2012.   On that date, the Company issued a press release disclosing that in order to comply with the MSHA's closure order, the Lucky Friday Mine would be closed through the end of 2012.  The press release further revealed that Hecla's silver production guidance for 2012 had been reduced to 7 million ounces from 9.5 million ounces. Based on recent market prices for silver, *the damage Hecla will suffer due to lost production from the Lucky Friday Mine is projected to be at least $80 million to $100 million*.

64.     On February 21, 2012, Hecla disclosed further adverse information concerning the drastic impact the unsafe conditions at Lucky Friday will have on the Company. Specifically, Hecla reported that the MSHA had approved the Company's plan to rectify the safety issues that led to the MSHA's January 5, 2012 closure order.  The plan indicates that *the Company will be damaged by an additional $50 million in costs to bring the Lucky Friday Mine into compliance* with MSHA safety regulations.

65.    The Individual Defendants bear ultimate responsibility for these calamitous developments, as in the face of known, widespread, and significant inadequacies in Hecla's safety controls for the Lucky Friday Mine, the Individual Defendants did not institute corrective measures.  Instead, in pursuit of revenues and profit above all else, and with callous lack of respect for the safety of Hecla's miners, the Individual Defendants drove the Lucky Friday Mine to operate illegally in noncompliance with numerous legal and regulatory safety requirements. As a result of the Individual Defendants' failures to fulfill their fiduciary duties, the Company has and will be significantly damaged.

## IMPROPER STATEMENTS

66.    In conjunction with their utter disregard for the applicable safety laws and regulations and failure to run the Lucky Friday Mine in a legal, safety-compliant manner, the Individual Defendants also exposed Hecla to significant damages as a result of violations of federal securities laws.  As alleged in the federal securities class action complaints on file in the United States District Court for the District of Idaho, from October 26, 2010 to January 11, 2012 disclosure, the Individual Defendants made and caused the Company to make improper public statements and material omissions.

67.    On October 26, 2010, Hecla issued a press release entitled "Hecla Reports a 30% Increase in Cash Flow from Its Operations in Q3 Compared to the Same Period in 2009."  The Company reported net income of $19.8 million, or $0.06 diluted earnings per share ("EPS") in the third quarter of 2010.  Further, the press release included lofty growth expectations for the Lucky Friday Mine, while failing to temper such expectations based on the unsafe conditions present at Lucky Friday.  The release stated in part:

> "Both Greens Creek and Lucky Friday had a good quarter and have generated more net cash from operating activities so far this year, compared to the full year of 2009, which was a record for Hecla," said Phillips S. Baker Jr.,

President and Chief Executive Officer. "Our cash position, strong operating performance and district size properties in the U.S. and Mexico, position us well to fund development and capital projects, as well as take advantage of other potential opportunities that may arise."

\* \* \*

**Lucky Friday**

At the Lucky Friday mine in Idaho, silver production was 0.8 million ounces at a total cash cost of $3.38 per ounce compared to 0.9 million ounces at a total cash cost of $3.42 per ounce in the same quarter in 2009. For the first nine months of 2010, Lucky Friday produced 2.5 million ounces of silver at a total cash cost of $3.67 per ounce, compared to 2.7 million ounces of silver at a total cash cost of $5.89 in the same period the prior year.

The third quarter total cash cost decrease of $0.04 per ounce of silver compared to the same period in the prior year, was mainly due to higher lead and zinc by-product credits resulting from increased average market prices for those metals and partially offset by higher price-sensitive production costs and taxes. For the nine months ended September 30, 2010, the $2.22 decrease in total cash cost per ounce of silver compared to the same period in 2009, is attributable to higher by-product credits and partially offset by costs that are sensitive to metals price increases.

The #4 Shaft Project is progressing and *Hecla believes it could increase the mines annual silver production by approximately 50% from current levels* and could extend the mine life beyond 2030. Total estimated capital expenditures would range between $150 and $200 million, for an internal shaft descending from the 4900 level to the 7800 level. Approximately $50 million of the total capital expenditures will be spent by year end. Engineering is underway to determine the feasibility of constructing the shaft to an ultimate depth of 8800 feet.

68.    On February 24, 2011, Hecla issued a press release announcing its fourth quarter and full year 2010 financial results.  The Company reported net income of $35.4 million, or $0.13 diluted EPS for the full year 2010.  Further, the Company reported record fourth quarter and full year revenues and cash flows from operating activities, in part due to strong production at Lucky Friday and the Company's ability to take advantage of high metal prices to translate Lucky Friday's production into impressive financial results.   The Individual Defendants,

however, failed to disclose the extreme shortcomings in the Lucky Friday Mine's compliance with mine safety laws and regulations. The release stated in part:

> "The *fourth quarter and year-end results were record setting in a number of areas, reflecting increased throughput and low costs at our Greens Creek and Lucky Friday operations, and strong metals prices*," said Hecla's President and Chief Executive Officer, Phillips S. Baker, Jr. "After considering all investing and financing activities, we generated $178.9 million in net cash flow last year. Our strong balance sheet and growing cash flow should be sufficient to meet our financial obligations of a potential Basin litigation settlement, as well as continuing to fund capital projects to expand our operations and explore our large land packages in the U.S. and Mexico."

**FINANCIAL OVERVIEW**

> Hecla reported *2010 and fourth quarter record revenues and cash flow from operating activities, surpassing the previous 120-year record set in 2009, as a result of increased tonnage at Lucky Friday and Greens Creek, and higher metals prices.*

> \* \* \*

> **Lucky Friday**

> Full year silver production at Lucky Friday was 3.4 million ounces and 819,317 ounces in the fourth quarter, compared to 3.5 million ounces and 865,595 ounces, in the respective periods in 2009. The overall decrease in production year-over-year and quarter-over-quarter is primarily due to lower silver ore grade, which was expected. The operation achieved record lead and zinc production in 2010 with 21,619 tons and 9,286 tons, respectively, which included 5,356 tons and 2,214 tons, respectively, in the fourth quarter.

69.    On April 18, 2011, Hecla issued a press release entitled "Hecla Provides Update on Fall of Ground at the Lucky Friday Operation," which stated in part:

> Hecla Mining Company ("Hecla") provides an update on the localized fall of ground in a stope which occurred at its Lucky Friday mine in Northern Idaho on April 15, 2011. An employee is unaccounted for.

> \* \* \*

> The Lucky Friday mine has ceased mining to focus on rescue operations. Hecla does not know how long the rescue efforts will continue or if it will impact the 2011 production guidance.

70.     On May 9, 2011, Hecla issued a press release announcing its first quarter 2011 financial results. The Company reported net income of $43.4 million, or $0.15 diluted EPS for the first quarter of 2011. Further, the Company reported for the quarter silver production of 2.5 million ounces at a total cash cost of $1.03 per ounce, net of by-products. The release stated in part:

> "Hecla's first quarter results were records for revenue, gross profit, and net income reflecting the strong operating performance and metals prices," said Hecla's President and Chief Executive Officer, Phillips S. Baker, Jr. "*We expect our balance sheet and growing cash flow will meet our financial obligations, fund capital projects that expand our operations, and advance organic growth projects on our large land packages in the U.S. and Mexico.*"

> * * *

> **Lucky Friday**

> First quarter silver production at Lucky Friday was 0.8 million ounces, which was slightly lower than the same period in 2010. The overall decrease in production quarter-over-quarter is primarily due to lower silver ore grade.

> Total cash cost at Lucky Friday was $4.99 per ounce, net of by-product credits, in comparison to $3.21 per ounce, for the same period in 2010. The increase in total cash cost per ounce quarter-over-quarter is mainly due to higher treatment and freight costs, employee profit-sharing due to higher metals prices, and increased production costs. This was partially off-set by higher lead and zinc by-product credits. Mining and milling costs per ton increased in the first quarter 2011 by 10% and 6%, respectively, due to a decrease in tonnage produced, increased fuel costs, and consumable underground materials.

> On April 15, 2011, a fatal accident occurred at the Lucky Friday Mine resulting in our decision to immediately halt all operations at the mine (other than rescue efforts) for a period of 10 days. The accident involved a localized fall of ground at 6150 level in the west 15 stope. The Mine Safety Health Administration ("MSHA") had representatives on-site during the rescue and recovery effort. They will access the mine during the investigation. Stopes 15 and 12 are currently closed; however, *it is not anticipated to impact guidance*.

71.     On August 8, 2011, Hecla issued a press release announcing final Board approval of the Lucky Friday #4 Shaft project, which stated in part:

"Hecla is now positioned to significantly grow production over the next five years," said Hecla's President and Chief Executive Officer, Phillips S. Baker, Jr. "With approval of the #4 Shaft Project, developments at the Greens Creek mine and the scoping studies in the Silver Valley, San Juan Silver, and San Sebastian properties, we have a goal of 15 million ounces of annual silver production by 2016. *We believe our strong financial position combined with cash flow generation from Greens Creek and Lucky Friday would be sufficient to cover our settlement obligations, sustaining and capital expenditures, pre-development projects, and exploration programs.*"

72.     On August 9, 2011, Hecla issued a press release announcing its second quarter 2011 financial results.  The Company reported net income of $33.3 million, or $0.11 diluted EPS for the second quarter of 2011.  Further, the Company reported, for the quarter, silver production of 2.3 million ounces at a total cash cost of $0.52 per ounce, net of by-products.  The release stated in part:

"Hecla had solid operational and financial results year-to-date generating significant cash flow from Greens Creek and Lucky Friday to fund our capital projects and meet our environmental settlement obligations," said Hecla's President and Chief Executive Officer, Phillips S. Baker, Jr. "The #4 Shaft Project combined with the new pre-development initiatives at our four properties are expected to increase production by approximately 50-60% over the next 5 years.

"We continue to benefit from high silver margins even with increasing industry cost pressures. Hecla's cost increase during the quarter is mainly attributable to higher metals prices, which was partially offset by strong by-product credits. Both Greens Creek and Lucky Friday remain among the lowest cost mines in the silver space."

*   *   *

**Lucky Friday**

Silver production at Lucky Friday was 0.8 million ounces in the second quarter of 2011 and 1.5 million ounces in the first half of 2011, compared to 0.8 million ounces and 1.7 million ounces, in the respective periods in 2010. The overall decrease in production year-over-year is primarily due to lower silver ore grade, which was expected.

Mining and milling costs were up by 9% for both the second quarter and six-month period ended June 30, 2011. The increase was driven primarily by increased cost of fuel, consumable underground materials, reagents, power, and maintenance supplies.

- 32 -

Total cash cost per ounce of silver produced at Lucky Friday was $6.46 and $5.74, net of by-product credits, for the second and first half of 2011, respectively, compared to $4.47 and $3.81, for the same respective periods in 2010. The increase in total cash cost per ounce quarter-over-quarter and year-over-year is primarily due to higher employee profit sharing, production costs, expensed site infrastructure, and treatment costs, which are partially offset by higher by-product credits resulting from higher zinc and lead prices. Higher profit sharing and treatment costs are due to higher metals prices.

73.     On November 8, 2011, Hecla issued a press release announcing its third quarter 2011 financial results.  The Company reported net income of $55.8 million, or $0.19 diluted EPS for the third quarter of 2011.  Further, the Company reported for the quarter silver production of 2.3 million ounces at a total cash cost of $0.67 per ounce, net of by-products.  The release stated in part:

"Hecla's financial position and asset base is the strongest it's been in its history after a unique third quarter generating the highest net income and cash position, establishing a dividend, approving the #4 Shaft, initiating work to reopen three mines, and settling the Basin litigation," said Hecla's President and Chief Executive Officer, Phillips S. Baker, Jr. "From this quarter, we are poised to grow production 50% over the next five years."

\* \* \*

**Lucky Friday Mine – Idaho**

Silver production at Lucky Friday was 0.9 million ounces in the third quarter of 2011 and 2.5 million ounces in the first nine months of 2011, which is substantially equal to the silver production for the respective periods in 2010.

Mining and milling costs per ton were up by 7% and 11%, respectively, for the third quarter and up by 9% and 10%, respectively, for the first nine months of 2011, driven primarily by increased cost of fuel, consumable underground materials, reagents, electric power, and maintenance supplies.

Total cash cost per ounce of silver produced at Lucky Friday was $5.94 and $5.82, net of by-product credits, for the third quarter and first nine months of 2011, respectively, compared to $3.38 and $3.67, for the same periods in 2010. The increase in total cash cost per ounce quarter-over-quarter was primarily due to higher employee profit sharing, higher treatment costs, and lower lead and zinc by-product credits by $1.82, $0.72, and $1.06 per ounce, respectively, which were partially offset by lower production costs of $1.12 per ounce. Higher profit

sharing and treatment costs were due to higher metals prices and lower by-product credits as the result of lower lead and zinc production.

74.     On November 18, 2011, Hecla issued a press release reporting an accident at the

Lucky Friday mine.  The release stated in part:

> Hecla Mining Company ("Hecla") reports an accident occurred at its Lucky Friday mine in Northern Idaho on November 17, 2011.
>
> The accident occurred as part of the construction of the #4 Shaft at the Lucky Friday operation. Two contractors were involved in the accident during routine activities involving the construction of a 16-foot diameter underground rock bin (a storage area for broken rock). The work involved drilling, blasting, and mucking of rock into a previously constructed area. Both men were believed to be wearing all required personal protection equipment, including fall protection. For reasons that are unknown at this time, the two men were drawn into material that was moving underneath them. Both contractors were removed from the area and transported to the hospital, and one has been released. All personnel are accounted for.
>
> "Our thoughts and prayers are with the family and for a safe recovery of the injured contractor," said Phil Baker, President and Chief Executive Officer. "Operating our mines safely is a top priority for Hecla, and we will continue to work to prevent such incidents from occurring."
>
> The accident is being investigated by the Company and representatives from the federal Mine Safety and Health Administration. The workers' families have been notified. The Lucky Friday mine has temporarily ceased mining to investigate this accident.

75.     Subsequently, on November 19, 2011, Hecla issued a press release announcing an

update about the Lucky Friday mine accident on November 18, 2011, which stated in part:

> Hecla Mining Company ("Hecla") is saddened by the news that Brandon Lloyd Gray, the 26-year-old miner critically injured at its Lucky Friday mine in North Idaho on November 17, succumbed to his injuries early Saturday morning with his family at his side. Gray, a miner since 2008, had been working for Cementation Inc. since February 2011, a company that is under contract for the construction of the mine's #4 Shaft.
>
> "We are deeply saddened by Brandon's passing," said Phil Baker, President and Chief Executive Officer. "Everyone at Hecla extends our sincere condolences to his family and loved ones."

Mike Nadon, President of Cementation U.S.A. said, "The whole Cementation family is grieving this terrible loss, and our immediate focus is in supporting Brandon's family with our assistance and our prayers."

Immediately following the accident, Hecla chose to cease mining operations at the Lucky Friday mine in order to focus our attention on the emergency response and to provide support to the affected employees and families of both Hecla and Cementation. The federal Mine Safety and Health Administration ("MSHA") subsequently issued a 103(j) order. An integrated team of Hecla and Cementation as well as representatives from MSHA are investigating the accident, which is unrelated to the fall of ground accident that occurred on April 15, 2011. A start-up date for resuming operations has not yet been established.

"Hecla is committed to preventing such accidents from happening," added Phil Baker, President and Chief Executive Officer. "We will continue to emphasize safety throughout all of our properties."

76.     On November 21, 2011, Hecla issued a press release entitled "Hecla Maintains 2011 Production and Cash Cost Guidance," which stated in part:

Hecla Mining Company ("Hecla") reports that *the suspension of operation on November 18 at its Lucky Friday mine is not expected to impact the 2011 silver production guidance* of 9 to 10 million ounces and cash cost of approximately $1.00 per ounce, net of by-products.

77.     On December 2, 2011, Hecla issued a press release entitled "Hecla Responds to MSHA's Accident Report," which stated in part:

Hecla Mining Company ("Hecla") received the Report of Investigation ("Report") from the United States Department of Labor Mine Safety and Health Administration ("MSHA") relating to the April 15, 2011 fatal accident at the Lucky Friday mine in Mullan, Idaho.

Prior to the fall of ground in April, Hecla's safety record at the Lucky Friday mine was excellent. Hecla employees, past and present, worked for more than 25 years, and 8.5 million man-hours without a fatality. During that same time period, the Company continued to make strides in accident reduction.

"Our Company works hard each day to have our miners return home safely to their families at the end of their shift. This has been a gut-wrenching time for our Company and for our communities," said Phil Baker, President and Chief Executive Officer. "In my opinion and upon examination, the Report does not substantiate MSHA's previously issued citations."

Hecla has already worked with MSHA to address issues outlined in the Report which resulted in the re-opening of the mine and continued operations. However, Hecla is contesting the citations referenced in the Report. For example, contrary to MSHA's claims, the work was being conducted in accordance with Hecla's ground control plan. Hecla understands MSHA is planning on posting the Report on its website in the near future.

78.     On December 15, 2011, Hecla issued a press release regarding a rock burst that had occurred in the Lucky Friday Mine, entitled "Hecla Reports Update on Lucky Friday Mine," which stated in part:

Hecla Mining Company ("Hecla") reports that all miners have been safely removed from the Lucky Friday mine near Mullan, Idaho, following a rock burst that occurred Wednesday, December 14, at approximately 7:40 p.m.

"We are thankful that all employees are out of the mine and have been accounted for, and that those injured have been treated. The safety of our employees is our primary concern," said Phil Baker, President and Chief Executive Officer. "The mine is currently shut down, and once we have cared for our people, we will be investigating the cause of the seismic activity."

The incident occurred at 5900 feet below the surface. Seven people were transported to local hospitals and treated for non-life-threatening injuries. No mine blasting had taken place anywhere in the mine for the previous 24 hours; therefore, the rock burst is unrelated to mining activities. The mine is currently closed pending further investigation. The federal Mine Safety and Health Administration has been notified and investigators are en route to the mine.

79.     Subsequently, on December 16, 2011, the Company issued a press release entitled "Hecla Reports Rock Burst Unrelated to Previous Events at the Lucky Friday Mine," which stated in part:

Hecla Mining Company ("Hecla") is reporting that the rock burst that injured seven miners Wednesday night at the Lucky Friday mine near Mullan, Idaho, is unrelated to two previous fatal accidents which occurred earlier in the year. In addition, all seven Hecla miners are expected to fully recover from their non-life-threatening injuries. Most of the miners were treated and released by area hospitals, with the most serious injuries involving lacerations, a broken arm and a broken pelvis. There were 25 Hecla employees and 18 contractor employees underground in the mine at the time of the rock burst. All were immediately evacuated, and most were not in the vicinity of the affected area.

"Thankfully, our miners were not more seriously injured and all seven are expected to fully recover," said Phil Baker, President and Chief Executive Officer for Hecla. "There's no connection to the previous fatal events. Our peoples' safety is very important to us, and we are working hard to get the mine back on track to its longstanding safety record prior to this year, characterized by more than 25 years and 8.5 million man-hours without a fatality."

On November 16, 2011, shortly after 1 a.m., Hecla reported a seismic event that caused a rock burst in approximately the same location as this most recent incident at 5900 feet below surface, in the area of the pillar that crosses through the 30 vein. This rock burst was triggered by mine blasting at the end of a shift. As a result, no one was in the area at the time of the incident and no injuries were reported.

The most recent incident also occurred at 5900 feet below the surface. Rock failures around a mining excavation can be triggered by natural occurrences or by mine blasting. Baker said Hecla was in the process of installing designed tunnel supports, which consist of a steel liner and other materials such as shotcrete, in that particular area. This method is very similar to that used in road construction in underground tunnels which is meant to provide a support canopy for the roadway.

"Both rock bursts occurred approximately in the same location; however, this most recent event was not triggered by mine blasting, since blasting had not taken place within the previous 24 hours. Consequently, we need more information about what triggered this rock burst," Baker said. "The mine is currently shut down to give us time to examine this in conjunction with federal Mine Safety and Health Administration representatives."

80.    On December 21, 2011, Hecla issued a press release entitled "Hecla Provides Update on Lucky Friday and Announces Hecla's 2012 Production Estimate," which stated in part:

Hecla Mining Company ("Hecla") reports that in order to ensure safe and efficient operations for its personnel, Hecla will develop a new haulage way to bypass the rock burst that occurred at the Lucky Friday mine near Mullan, Idaho, on December 14. *Creating the bypass and reestablishing mine production is expected to be complete by the end of February 2012.*

Hecla's silver output *remains within its previous estimates* with 2011 production expected at more than 9 million ounces and cash cost estimates remaining unchanged at approximately $1.00 per ounce, net of by-products. *For 2012, Hecla expects to increase silver production to more than 9.5 million ounces including the loss of two months of production at the Lucky Friday mine while the bypass is completed.*

Phil Baker, Hecla's President and Chief Executive Officer said: "While 2011 has been a difficult year for Hecla and the Lucky Friday, the previous 25 years at the Lucky Friday have been characterized by an extraordinary safety record. Looking forward, our goal, which we will relentlessly pursue, is to reestablish the same safety and operating performance decades into the future. I am happy to report that everyone who was injured on December 14 has been released from the hospital and is on the road to recovery."

Hecla will not repair the area where the rock burst occurred. Instead, Hecla is planning a 750-foot bypass creating a new haulage way, which will be a significant distance from where the rock burst occurred and in a previously mined area reducing the risk of future rock bursts.

Hecla expects that a majority of Lucky Friday employees will stay at the mine to work on the bypass or other Lucky Friday projects. Any remaining qualified employees will be given the opportunity to work at Hecla's other properties.

Hecla closed the mine when the accident occurred on December 14 to ensure employee safety, investigate the accident, and evaluate alternative plans. Subsequently, the federal Mine Safety and Health Administration ("MSHA") issued an order closing the mine. Hecla is working with MSHA to finalize the investigation and lift the closure order to start the development of the new haulage way, resume construction of the #4 Shaft, and work on other maintenance projects.

## THE TRUTH EMERGES

81.    The truth behind the Company's business prospects and Individual Defendants' wrongdoing began to emerge when on January 11, 2012, Hecla issued a press release entitled "Hecla Reports Temporary Care and Maintenance at Lucky Friday Mine," which stated in part:

Hecla Mining Company ("Hecla") reports that the *Mine Safety and Health Administration ("MSHA") has ordered the Silver Shaft at the Lucky Friday mine in Mullan, Idaho closed for removal of built-up material in the shaft*. This order is pursuant to the investigation following the December 14, 2011 rock burst. Compliance with the order is expected to take through year-end. Hecla's 2012 silver production is now estimated to be approximately 7 million ounces.

"While we are disappointed with this order and are considering what action we might take, work has already begun to resume production as quickly as possible," said Phil Baker, Hecla's President and Chief Executive Officer. "The Lucky Friday mine is a world-class mine that we see producing silver for decades to come. Hecla and the Lucky Friday mine have faced challenges in the past and we will once again overcome them."

The Silver Shaft is a one-mile deep shaft from surface and the primary access to the Lucky Friday mine. The sand and concrete material to be removed from the shaft has built up over a number of years and is expected to be removed primarily by power washing. All other significant activities at the mine including construction of the #4 Shaft and bypass around the rock burst are on hold. Care and maintenance of the underground will be focused on the 4900 level where the #4 Shaft infrastructure is located. Production is expected to resume in early 2013.

82.     On this news, Hecla's market capitalization plunged more than 21%, erasing almost $344 million in market capitalization in a single day.

## REASONS THE STATEMENTS WERE IMPROPER

83.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)     The Company was not in compliance with safety regulations at its Lucky Friday mine;

(b)     The Company had allowed sand and concrete material to improperly build up in the Silver Shaft over a period of years, creating a safety hazard;

(c)     Following the December closure, the Company would be unable to reestablish mining operations at the Lucky Friday mine by February 2012;

(d)     The Company improperly accounted for its contingent liabilities in violation of GAAP; and

(e)     Based on the foregoing, defendants lacked a reasonable basis for their positive statements about the Company's operations and its expected silver production.

## HECLA'S ACCOUNTING FOR CONTINGENT LIABILITIES VIOLATED GAAP

84.     The Individual Defendants violated GAAP[1] by failing to properly recognize contingencies related to known fines, remediation, and losses associated with the illegal operation of the Lucky Friday Mine.  GAAP, Accounting Standards Codification ("ASC") Topic 450-20, *Loss Contingencies*, requires the accrual of a loss contingency by a charge to income, (in the case of Hecla the charge would be in the form of a loss reserve) if, at the time the financial statements are issued, it is probable that a contingent liability or potential loss has been incurred, and the loss can be reasonably estimated.  The purpose of those conditions is to require accrual of losses (charge to income in terms of an expense) when they are reasonably estimable and relate to the current or a prior period.

85.     Pending or threatened litigation and actual or possible claims and assessments is a loss contingency under ASC Topic 450-20 that must be accrued for in a company's financial statements.  ASC Topic 450-20-55-14, further requires that when it is probable that the case of a *"catastrophe, accident, or other similar physical occurrence"* or an *"investigation of an entity by a governmental agency, if enforcement proceedings have been or are likely to be instituted,"* then an entity must record an accrual (charge against income) for the reasonably estimated potential costs.

---

[1] GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures, which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

86.     The Individual Defendants made the determination that absolutely no reserve charges were necessary in the face of the negative evidence that was available to the Individual Defendants throughout the relevant period.   From the moment the Individual Defendants received, and ignored, their first warning regarding the issues surrounding the Lucky Friday Mine, they were on notice that the safety and illegal use of the mine was not only dangerous, but was in violation of numerous MSHA regulations that would result in Hecla having to pay substantial fines, remediation, and litigation for its continued operation.   Defendants clearly knew or were reckless in not knowing that Hecla continued to unlawfully operate the Lucky Friday mine.   As described herein, this is not the first time Hecla has been put on notice by the MSHA and received numerous citations and fines related to their unsuitable mining operations.   This evidence demonstrated that it was probable that Hecla would incur substantial fines, remediation, and litigation in connection with its continued operation of the Lucky Friday Mine, and as such amounts were reasonably estimable, the Individual Defendants were required to reserve accordingly.

## INSIDER SALES BY DEFENDANTS BAKER, SABAL, AND TAYLOR

87.     Rather than providing the market with correct information, the Insider Selling Defendants used their knowledge of Hecla's material, non-public information to sell their personal holdings while the Company's stock was artificially inflated.   As officers and directors of Hecla, defendants were privy to material, non-public information about the Company's true business health.

88.     While in possession of this knowledge, defendant Baker sold 246,000 shares of his personally held Hecla stock for proceeds of $1,962,268.20.   Defendant Baker's sales were timed to maximize profit from Hecla's then artificially inflated stock price.   Defendant Baker's sales are suspicious given that his stock sales represented 26.86% of his holdings as

demonstrated by the chart below, and that he sold over 89% more shares during the relevant period than in the previous period of the same length.

| | |
|---|---|
| Shares Sold During Relevant Period | 246,000 |
| Shares Remaining After Sales | 669,692 |
| Total Shares Before Sales | 915,692 |
| **Total Proceeds from Sales** | **$1,962,268.20** |
| **% of Total Ownership Sold** | **26.86%** |

89.     In addition, also while in possession of this knowledge, defendant Sabala sold 124,406 shares of his personally held Hecla stock for proceeds of $1,094,493.38.   Defendant Sabala's sales were timed to maximize profit from Hecla's then artificially inflated stock price. Defendant Sabala's sales are suspicious given that his stock sales represented 76.37% of his holdings as demonstrated by the chart below, and that he sold over 46% more shares during the relevant period than in the previous period of the same length.

| | |
|---|---|
| Shares Sold During Relevant Period | 124,406 |
| Shares Remaining After Sales | 38,494 |
| Total Shares Before Sales | 162,900 |
| **Total Proceeds from Sales** | **$1,094,493.38** |
| **% of Total Ownership Sold** | **76.37%** |

90.     Finally, also while in possession of this knowledge, defendant Taylor sold 14,724 shares of his personally held Hecla stock for proceeds of $107,311.68.   Defendant Taylor's sales were timed to maximize profit from Hecla's then artificially inflated stock price.   Defendant Baker's sales are suspicious given that his stock sales represented 91.93% of his holdings as demonstrated by the chart below, and that he did not sell any shares during the same length period prior to the relevant period.

| | |
|---|---|
| Shares Sold During Relevant Period | 14,724 |
| Shares Remaining After Sales | 1,292 |
| Total Shares Before Sales | 16,016 |
| **Total Proceeds from Sales** | **$107,311.68** |
| **% of Total Ownership Sold** | **91.93%** |

91.     In sum, defendants Baker, Sabala, and Taylor sold over $3.1 million worth of Hecla stock at artificially inflated prices as detailed by the chart below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| BAKER | 11/5/2010 | 146,000 | $7.98 | $1,164,598.20 |
| | 11/5/2010 | 100,000 | $7.98 | $797,670.00 |
| | | 246,000 | | $1,962,268.20 |
| | | | | |
| SABALA | 11/5/2010 | 78,534 | $7.92 | $622,319.12 |
| | 3/2/2011 | 45,872 | $10.29 | $472,174.26 |
| | | 124,406 | | $1,094,493.38 |
| | | | | |
| TAYLOR | 11/1/2010 | 1,724 | $6.84 | $11,797.68 |
| | 11/1/2010 | 8,000 | $6.84 | $54,756.00 |
| | 11/8/2010 | 3,000 | $8.33 | $24,996.00 |
| | 9/6/2011 | 2,000 | $7.88 | $15,762.00 |
| | | 14,724 | | $107,311.68 |
| | | | | |
| Total: | | 385,130 | | $3,164,073.26 |

## DAMAGES TO HECLA

92.     As a result of the Individual Defendants' improprieties, Hecla operated the Lucky Friday Mine illegally without the required safety systems and protocols and disseminated improper public statements concerning the safety and continuing operability of the Lucky Friday Mine and the Company's accounting for its contingent liabilities.  The Individual Defendants' failure to ensure that the Lucky Friday Mine's safety systems and protocols were in compliance with legal requirements will damage the Company by up to $150 million or more due to: (i) lost income on silver production while Lucky Friday is shut down, which will cost Hecla at least $80 million to $100 million; and (ii) costs to repair the Lucky Friday Mine, which the Company currently estimates at $50 million.  Also, the improper statements have devastated Hecla's credibility as reflected by the Company's more than $1.6 billion, or 55.7%, market capitalization loss from the relevant period high.

93.    Further, as a direct and proximate result of the Individual Defendants' actions, Hecla has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws;

(b)    costs incurred from the nearly $1 million fine resulting from the April 15, 2011 incident;

(c)    costs incurred from additional fines and penalties to be assessed as a result of the November 17, 2011 and December 14, 2011 incidents and myriad additional violations; and

(d)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Hecla.

94.    Moreover, these actions have irreparably damaged Hecla's corporate image and goodwill.  For at least the foreseeable future, Hecla will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that Hecla's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

95.    Plaintiff brings this action derivatively in the right and for the benefit of Hecla to redress injuries suffered, and to be suffered, by Hecla as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Hecla is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

96.     Plaintiff will adequately and fairly represent the interests of Hecla in enforcing and prosecuting its rights.

97.     Plaintiff was a shareholder of Hecla at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Hecla shareholder.

98.     The current Board of Hecla consists of the following seven individuals: defendants Baker, Bowles, Crumley, Nethercutt, Rogers, Stanley, and Taylor. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because the Director Defendants' Conduct Is Not a Valid Exercise of Business Judgment**

99.     The challenged misconduct by defendants Baker, Bowles, Crumley, Nethercutt, Rogers, Stanley, and Taylor at the heart of this case constitutes a threat to the Company's very survival. As the ultimate decision-making body of the Company, the Board affirmatively adopted, implemented, and condoned a business strategy based on deliberate and widespread improper activities. Indeed, this business strategy entailed seeking increased revenues and profits as a cost of wanton disregard for compliance with applicable safety laws and regulations at the Lucky Friday Mine. Causing the Company to engage in the improper and illegal tactics that threaten its survival is not a protected business decision and such conduct can in no way be considered a valid exercise of business judgment. Accordingly, demand on the Board is excused.

**Demand Is Excused Because Defendants Baker, Bowles, Crumley, Nethercutt, Rogers, Stanley, and Taylor Face a Substantial Likelihood of Liability for Their Misconduct with Respect to Hecla's Safety Compliance**

100.    As alleged above, defendants Baker, Bowles, Crumley, Nethercutt, Rogers, Stanley, and Taylor also breached their fiduciary duties of loyalty by failing to ensure that the

Lucky Friday Mine was in compliance with applicable legal and regulatory safety requirements. Due in part to the extensive history of Lucky Friday's MSHA citations and the worsening trend in such citations, particularly with respect to the increased frequency and severity of such citations, defendants Baker, Bowles, Crumley, Nethercutt, Rogers, Stanley, and Taylor were aware, or reckless in not being aware, that the Lucky Friday Mine's safety controls were grossly inadequate. Further, defendants Baker, Bowles, Crumley, Nethercutt, Rogers, Stanley, and Taylor were aware of the heightened regulatory risk associated the MSHA's special impact inspections and, as acknowledged in Hecla's risk factors, that such regulatory risk, particularly when resulting in MSHA citations, could have a materially adverse effect on the Company. Thus, defendants Baker, Bowles, Crumley, Nethercutt, Rogers, Stanley, and Taylor face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

101.    Further, the HSET Committee Defendants, Bowles, Rogers, Stanley, and Taylor, had a heightened duty to review the Company's health, safety, and environmental policies, to review emerging health, safety, and environmental trends in legislation and regulations affecting the Company, to ensure that the Company's compliance systems are effective, and to report compliance issues and other significant matters to the Board. These responsibilities were set forth in the HSET Committee Charter. Thus, the HSET Committee Defendants were responsible for knowingly, or recklessly, allowing the improper conduct related to the failure to ensure that the Lucky Friday Mine was in compliance with applicable legal and regulatory safety requirements. Thus, defendants Bowles, Rogers, Stanley, and Taylor face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

102.    The Audit Committee Defendants, Bowles, Christensen, Rogers, and Stanley, also had heightened responsibilities concerning the Company's financial reporting, risk control, and legal compliance, as set forth in the Audit Committee Charter.  Concerning risk control and legal compliance, the Audit Committee Defendants' specific responsibilities under the Audit Committee Charter include assessing the Company's risk and risk management.  However, defendants Bowles, Rogers, and Stanley breached their fiduciary duties by knowingly, or recklessly, allowing the improper conduct related to the failure to ensure that the Lucky Friday Mine was in compliance with applicable legal and regulatory safety requirements.  Thus, defendants Bowles, Rogers, and Stanley face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

**Demand Is Excused Because Defendants Baker, Bowles, Crumley, Nethercutt, Rogers, Stanley, and Taylor Face a Substantial Likelihood of Liability for Their Misconduct with Respect to Hecla's Public Statements and Financial Reporting**

103.    As alleged above, defendants Baker, Bowles, Crumley, Nethercutt, Rogers, Stanley, and Taylor also breached their fiduciary duties of loyalty by failing to ensure that the Lucky Friday Mine was in compliance with applicable legal and regulatory safety requirements. Due in part to the extensive history of Lucky Friday's MSHA citations and the worsening trend in such citations, particularly with respect to the increased frequency and severity of such citations, defendants Baker, Bowles, Crumley, Nethercutt, Rogers, Stanley, and Taylor were aware, or reckless in not being aware, that the Lucky Friday Mine's safety controls were inadequate.  Further, defendants Baker, Bowles, Crumley, Nethercutt, Rogers, Stanley, and Taylor were aware of the heightened regulatory risk associated the MSHA's special impact inspections and, as acknowledged in Hecla's risk factors, that such regulatory risk, particularly when resulting in MSHA citations, could have a materially adverse effect on the Company. Thus, defendants Baker, Bowles, Crumley, Nethercutt, Rogers, Stanley, and Taylor face a

substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

104.    Further, the Audit Committee Defendants, Bowles, Rogers, and Stanley, had heightened responsibilities concerning the Company's financial reporting, risk control, and legal compliance, as set forth in the Audit Committee Charter. With respect to financial reporting and legal compliance, the specific responsibilities of the Audit Committee Defendants under the Audit Committee Charter include ensuring the Company's financial statements are complete and reflect appropriate accounting principles, reviewing the Company's accounting estimates and use of reserves and accruals, and reviewing legal compliance matters and ensuring the proper systems exist to ensure that the Company's financial statements and public disclosures comply with legal requirements. However, defendants Bowles, Rogers, and Stanley breached their fiduciary duties by making and approving improper statements in the Company's press releases and SEC filings regarding: (i) the Lucky Friday Mine's compliance with applicable legal and regulatory safety requirements; (ii) prospects for future production at the Lucky Friday Mine given failing safety systems and protocols; and (iii) the Company's compliance with GAAP with respect to its accounting for contingent liabilities. Thus, defendants Bowles, Rogers, and Stanley face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

**Further Evidence Supports the Excusal of Demand as to Defendants Baker, Bowles, Crumley, Nethercutt, Rogers, Stanley, and Taylor**

105.    Defendants Baker, Bowles, Crumley, Nethercutt, Rogers, Stanley, and Taylor all face a substantial likelihood of liability for breaching their duty of loyalty. These defendants were either informed of the Company's numerous safety violations or are consciously violating their duty to stay informed about the core business of the Company. Despite this knowledge,

Baker, Bowles, Crumley, Nethercutt, Rogers, Stanley, and Taylor failed to act to correct the Company's numerous violations of applicable safety laws and regulations. Such a decision could not have been an action taken in good faith. Furthermore, Baker, Bowles, Crumley, Nethercutt, Rogers, Stanley, and Taylor's conscious failure to act in the face of the overwhelming number of warnings is a breach of their duty of loyalty, which subjects them to a substantial likelihood of liability. Therefore, demand is excused.

106. Defendants Baker, Sabala, and Taylor sold Hecla stock under highly suspicious circumstances. Defendants Baker, Sabala, and Taylor, as officers and/or directors of the Company, possessed material, non-public company information and used that information to benefit themselves. Defendants Baker, Sabala, and Taylor sold stock based on this knowledge of material, non-public Company information that: (i) the Lucky Friday Mine was not in compliance with applicable legal and regulatory safety requirements; (ii) production at the Lucky Friday Mine would be severely hampered as a result of failing safety systems and protocols; and (iii) the Company's accounting for contingent liabilities was in violation of GAAP, and the impending decrease in the value of his holdings of Hecla. Accordingly, defendants Baker, Sabala, and Taylor face a substantial likelihood of liability for breaches of their fiduciary duty of loyalty. Any demand upon defendants Baker, Sabala, and Taylor is futile.

107. Any suit by the current directors of Hecla to remedy these wrongs would expose defendants Baker, Sabala, and Hecla to liability for violations of the federal securities laws in the pending securities class actions, and would result in civil actions being filed against one or more of the other Individual Defendants. The securities class action alleges violations of Sections 10(b) and 20(a) of the Exchange Act. If the Board elects for the Company to press forward with its right of action against defendants Baker and Sabala in this action, then Hecla's efforts would

- 49 -

compromise its defense of the securities class action.  Accordingly, demand on the Board is excused.

108.    The principal professional occupation of defendant Baker is his employment with Hecla, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above.  Accordingly, defendant Baker lacks independence from defendants Bowles, Crumley, Nethercutt, Rogers, Stanley, and Taylor due to his interest in maintaining his executive positions at Hecla.  This lack of independence renders defendant Baker incapable of impartially considering a demand to commence and vigorously prosecute this action.  In the most recently reported period, for example, Hecla paid defendant Baker the following compensation:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Qualified Deferred Compensation Earnings | All Other Compensation | Total |
|------|--------|-------------|---------------|----------------------------------------|------------------------------------------|------------------------|-------|
| 2010 | $445,000 | $436,220 | $441,744 | $1,133,700 | $445,799 | $12,792 | $2,915,255 |

Accordingly, defendant Baker is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation. Demand is futile as to defendant Baker.

109.    Moreover, the acts complained of constitute violations of the fiduciary duties owed by Hecla's officers and directors and these acts are incapable of ratification.

110.    Each of the Director Defendants of Hecla authorized and/or permitted the improper statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the improper statements and are principal beneficiaries of the wrongdoing

alleged herein and thus, could not fairly and fully prosecute such a suit even if such suit was instituted by them.

111.     Hecla has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Hecla any part of the damages Hecla suffered and will suffer thereby.

112.     If Hecla's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of Hecla. However, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Hecla against these defendants, known as the "insured versus insured exclusion." As a result, if these directors were to cause Hecla to sue themselves or certain of the officers of Hecla, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance, then the current directors will not cause Hecla to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

113.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Hecla for any of the wrongdoing alleged by plaintiff herein.

114.    Plaintiff has not made any demand on the other shareholders of Hecla to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    Hecla is a publicly held company with over 285 million shares outstanding and thousands of shareholders;

(b)    making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)    making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

115.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

116.    The Individual Defendants owed and owe Hecla fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Hecla the highest obligation of good faith, fair dealing, loyalty, and due care.

117.    The Individual Defendants and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, candor, good faith, and supervision.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Hecla, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

118.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) the Lucky

Friday Mine was not in compliance with applicable legal and regulatory safety requirements; (ii) production at the Lucky Friday Mine would be severely hampered as a result of failing safety systems and protocols; and (iii) the Company's accounting for contingent liabilities was in violation of GAAP. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

119.    The Director Defendants, as directors of the Company, owed Hecla the highest duty of loyalty. These defendants breached their duty of loyalty by recklessly permitting the improper activity concerning the Lucky Friday Mine's noncompliance with applicable legal and regulatory safety requirements and the improper statements concerning the Company's business prospects. Defendants Baker, Bowles, Christensen, Crumley, Nethercutt, Rogers, Stanley, and Taylor knew or were reckless in not knowing that: (i) the Lucky Friday Mine was not in compliance with applicable legal and regulatory safety requirements; (ii) production at the Lucky Friday Mine would be severely hampered as a result of failing safety systems and protocols; and (iii) the Company's accounting for contingent liabilities was in violation of GAAP. Accordingly, defendants Baker, Bowles, Christensen, Crumley, Nethercutt, Rogers, Stanley, and Taylor breached their duty of loyalty to the Company.

120.    The HSET Committee Defendants, Bowles, Rogers, Stanley, and Taylor, breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the HSET Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The HSET Committee Defendants completely and utterly failed in their duty of oversight, and defendants Bowles, Rogers, Stanley, and Taylor failed in their duty to review emerging health, safety, and environmental trends in legislation and regulations affecting the Company, to ensure that the Company's compliance

systems are effective, and to report compliance issues and other significant matters to the Board, as required by the HSET Committee Charter in effect at the time.

121.    The Audit Committee Defendants, Bowles, Christensen, Rogers, and Stanley, breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.   The Audit Committee Defendants completely and utterly failed in their duty of oversight, and defendants Bowles, Christensen, Rogers, and Stanley failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.   The Audit Committee Defendants also completely and utterly failed in their duty under the Audit Committee Charter to assess the Company's risk and risk management, ensure the Company's financial statements were complete and reflected appropriate accounting principles, review the Company's accounting estimates and use of reserves and accruals, and review legal compliance matters and ensure the proper systems exist to ensure that the Company's financial statements and public disclosures comply with legal requirements

122.    Defendants Baker, Sabala, and Taylor breached their duty of loyalty by selling Hecla stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's shareholders.   The information described above was proprietary, non-public information concerning the Company's future business prospects.   It was a proprietary asset belonging to the Company, which defendants Baker, Sabala, and Taylor used for their own benefit when they sold Hecla common stock.

123.    As a direct and proximate result of the Individual Defendants' beaches of their fiduciary obligations, Hecla has sustained significant damages, as alleged herein.   As a result of

the misconduct alleged herein, these defendants are liable to the Company.

124.     Plaintiff, on behalf of Hecla, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

125.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.     As a result of the Individual Defendants' breaches of duty to the Company by failing to conduct proper supervision, the Individual Defendants have caused Hecla to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

127.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

128.     Plaintiff, on behalf of Hecla, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

129.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Hecla.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Hecla.

131.     Defendants Baker, Sabala, and Taylor sold Hecla stock while in possession of material, adverse non-public information that artificially inflated the price of Hecla stock.  As a

result, defendants Baker, Sabala, and Taylor profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

132.    Plaintiff, as a shareholder and representative of Hecla, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

133.    Plaintiff, on behalf of Hecla, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Hecla, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing Hecla to take all necessary actions to reform and improve its safety systems and protocols at the Lucky Friday Mine such that such safety controls are in compliance with applicable legal and regulatory requirements;

C.    Directing Hecla to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Hecla and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1.    a proposal to enhance the HSET Committee and Audit Committee's oversight responsibilities as pertain to the compliance of Hecla's mining properties with applicable legal and regulatory requirements;

2.      a proposal to strengthen the Company's controls over financial reporting;

3.      a provision to control insider selling;

4.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

5.      a provision to permit the shareholders of Hecla to nominate at least three candidates for election to the Board; and

6.      a proposal to strengthen Hecla's oversight of its disclosure procedures;

D.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Hecla has an effective remedy;

E.      Awarding to Hecla restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

F.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 21, 2012

JOHNSON & MONTELEONE, L.L.P.

SAM JOHNSON

405 S. Eighth Street, Suite 250
Boise, Idaho  83702
Telephone:  (208) 331-2100
Facsimile:  (208) 947-2424
sam@treasurevalleylawyers.com

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
KEVIN SEELY
CHRISTOPHER WALTERS
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile:  (619) 525-3991
brobbins@robbinsumeda.com
kseely@robbinsumeda.com
cwalters@robbinsumeda.com

Attorneys for Plaintiff Gerald Moss

704754

## VERIFICATION

I, Gerald Moss, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 2/28/2012

GERALD MOSS

Cpt (Moss) - ver.DOC